IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DONALD NEWELL**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:18cv1162 |
| | ) | **Electronic Filing** |
| **STEVEN LAW**, an individual acting in | ) | |
| his official capacity, **CHARLES** | ) | |
| **HASSENFELDT**, an individual acting in | ) | |
| his official capacity, **DANIEL BIDDLE**, | ) | |
| an individual acting in his official capacity, | ) | |
| **ANTHONY SVETZ**, an individual acting | ) | |
| in his official capacity, and **HEATHER** | ) | |
| **CLEM-JOHNSON**, acting in her official | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Donald Newell ("plaintiff") commenced this civil rights action seeking redress for the alleged use of excessive force on April 5, 2018, during an interaction between himself and defendants. This interaction is alleged to have occurred as part of defendants' response to a 911 call reporting an incident of domestic violence involving plaintiff's younger son and the son's domestic partner. Presently before the court is defendants' motion for summary judgment. For the reasons set forth below, the motion will be granted in part and denied in part.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(A). Rule 56 "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Marten v.

Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  Deciding a summary judgment motion requires the court to view the facts, draw all reasonable inferences and resolve all doubts in favor of the nonmoving party.  Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(E)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" . . . "and cannot simply reassert factually unsupported allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts,

2

are insufficient to create issues of material fact that would preclude summary judgment."). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence is merely colorable or lacks sufficient probative force summary judgment may be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the backdrop that follows. On April 5, 2018, the Pennsylvania State Police (PSP) responded to a 911 call reporting that an incident of domestic violence had occurred at 104 Upper Hulltown Road, Lower Tyrone Township, Fayette County. (SMF (Doc. No. 73) at ¶ 111); Incident Reports (Doc. No. 74-4 at 1-12. Plaintiff owns two homes at 104 and 108 Upper Hulltown Road ("104" and "108"). (Id. ¶ 114). He has two sons named Donald James Newell ("Donald James") and Dustin Thomas Newell ("Dustin"). (Id. ¶ 7). Donald James and his domestic partner live at 108; Dustin and his domestic partner, Noell Brown, live at 104. Dustin and Noell have two children together and have been in a relationship (on again, off again) over approximately ten years. (Id. ¶ 8). Prior to April 5, 2018, Brown had been subjected to various degrees of physical and verbal abuse by Dustin and had sought and obtained Protection from Abuse (PFA) orders on behalf of herself and her children. (Id. ¶ 9). She did not have a PFA against Dustin on April 5, 2018. (Id. ¶ 10).

On the night in question Dustin and his oldest daughter left the residence to go to a convenience store.[1]  While they were gone, Noell discovered Dustin's cellular telephone and began to peruse through its contents.  When Dustin and his daughter returned home, Noell confronted Dustin and accused him of being unfaithful with another woman.  An argument between the two ensued, and Noell then attempted to gather some personal items and leave with her two daughters.  The argument escalated and Noell came out of the house and headed into the street.  At that juncture Donald James and his significant other became aware of the disturbance and came out of their home in an effort to intervene.  As Noell left the house and ran toward the street, Dustin followed her.  Dustin caught up to her, grabbed her, and stabbed her in the chest with a knife.  Just after that Donald James tackled Dustin and pulled him of Noell.  Noell then ran to Donald James' house at 108 and sought refuge inside.  Dustin retreated to the basement at 104.  Donald James' significant other assisted Noell and applied a towel to control the bleeding.

Donald James called 911 and reported the incident.  He stated in the call that his brother (Dustin) and Noell were fighting and when Donald James came out of the house with his significant other they became aware that Noell, who was in her twenties, had been stabbed. Donald James told the 911 operator that Dustin was the one who had stabbed Noell and she had injuries in the left area of the chest and on her neck.

---

[1]  The portions of the record recounted without a specific citation to defendants' statement of material facts are taken from a comprehensive review of the exhibits submitted by the parties, with careful consideration being given to the content of the police reports (Doc. No. 74-4) and the entirety of plaintiff's deposition testimony (Doc. No. 74-12).  Of course, the entirety of the record also was considered in adopting those portions of defendants' statement that recount the record in a short, concise, accurate and non-zealous manner that the court found helpful.

Donald James then hung up and called his father, plaintiff, and told him that he needed to come down to the house. Donald James was then contacted by 911 dispatch. At this point Donald James advised that Dustin was somewhere in the vicinity but his precise location was unknown.

Plaintiff traveled to 108, went inside the house and saw that Noell was bleeding. Her condition appeared to be stable so plaintiff went looking for Dustin. He went through all of the rooms inside 104 but did not find Dustin. He looked for the keys to gain access to the basement, but could not find them. He went outside and attempted to enter the basement through a locked outside entrance. He broke the locked door open and went down a short flight of stairs and into the basement. He discovered Dustin lying on the floor and bleeding. He was motionless and had stab wounds that later were determined to be self-inflicted. There were keys, a jacket, and a knife lying on the floor in close proximity to Dustin. Upon discovering Dustin in a pool of blood, plaintiff began to scream "call 911."

Upper Hulltown Road is in close proximity to the border between the Belle Vernon and Uniontown state police stations and troopers from both barracks were dispatched in response to Donald James' 911 call. Defendant Lauren Vernail ("Vernail") was the first defendant to arrive at the scene. (SMF ¶ 26). She came in contact with a municipal police officer who advised her about the status of the victim and then indicated that the assailant had ran off into the nearby house at 104. She radioed for expedited backup and she and the municipal officer attempted to secure the outside perimeter of 104 by stationing themselves at opposite corners on the front of the house where they could see the front and the sides of the building.

Prior to arriving at the scene, defendant Svetz and his partner defendant Biddle (who was training Svetz that day) received information that a white male with a knife had stabbed a

female.  They arrived and parked in front of the residence at 104.  They were then informed by another officer that other officers were in the back of the residence.  They proceeded to the rear and in the process were joined by Vernail.  Vernail informed them that a white male was in the house.

At the rear side of 104 officers Svetz, Biddle and Vernail came to discover the open door with three or four steps leading down into the basement.  Plaintiff was standing just beyond the bottom of the steps and Dustin was lying on the floor just beyond plaintiff.  Officers Svetz and Biddle began to direct commands at plaintiff, telling him to reveal himself, show his hands and get down on the ground.

At this juncture the parties' respective accounts of what happened diverge dramatically.  Plaintiff's testimony conveys the following.  Plaintiff was ordered to reveal himself and show his hands, which he did.  He was then ordered to lie down on the ground, which he did.  He was then ordered to get up and show his hands, which he did.  He tried to keep his hands in sight and was able to do so except when he had to use them to get up and down as directed.  He was not defiant, confrontational, argumentative, or otherwise refusing to comply with the officers' commands.

On the third time when the officers commanded him to get on the ground, they added a new command to crawl up the stairs.  Believing that his son was in need of immediate assistance and further delay would only ensue if he tried to crawl up the stairs, plaintiff announced that he

would walk up out of the basement slowly with his hands in the air.[2]  Plaintiff then walked up the stairs slowly and tried to keep his hands up and in sight while doing so.

When he reached the top of the stairs, the officers directed plaintiff to get down on the ground, which he did.  They then directed him to put his hands behind his back, which he did.  In the process of placing the handcuffs on plaintiff, Svetz and Biddle were forcing plaintiff's arms, and particularly his hands and fingers, way up into his shoulder blades, causing significant pain.

By this point in time Vernail and defendant Officer Martier had joined Svetz and Biddle in their efforts to handcuff and secure plaintiff.  Once plaintiff was cuffed, Svetz, Martier and Biddle began to punch plaintiff in the back and took their knees and with the force of their weight drove them down into plaintiff's back.  Plaintiff could not breathe, began to struggle in order to gain the ability to breathe and told the officers to get off his back.  Throughout this time Vernail restricted plaintiff by cradling his lower legs with her arms and using her weight in an effort to keep him from moving.  Biddle then jumped to his feet, kicked plaintiff in the back of the head while he was lying on his stomach, and then directed the other two officers to raise plaintiff up.  Svetz and Martier then pulled up on plaintiff's handcuffed arms while plaintiff remained on his stomach, raising and bending him up like a banana.  Biddle then kicked plaintiff in the face; as he did so plaintiff was able to turn his face somewhat.  The bottom, flat part of Biddle's boot struck plaintiff's face in the area between his forehead and temple.  Shortly thereafter Dustin walked up out of the basement in the escort of other officers.

---

[2]  A secondary reason for plaintiff walking instead of crawling up the stairs as directed was the pain he would experience in his knees if he were to crawl on concrete.

7

The officers then brought plaintiff up on his feet and took him around the side of the house.  Plaintiff was given <u>Miranda</u> warnings and placed in a patrol car.

At one point plaintiff showed Officer Janosko where he had been kicked in the face and told him about the mistreatment.  Officer Janosko said he could get the badge numbers of the officers and explained that plaintiff could file a claim with the State Police Bureau about being beaten.  Officer Janosko did not follow up or provide plaintiff with the badge numbers of the officers who had seized, cuffed, kneed, punched and kicked him.

Plaintiff thereafter was asked by an officer, whom he believed to be officer Biddle, if he wanted to be taken to the hospital.  Initially plaintiff said yes and Biddle started the car.  Plaintiff then reconsidered because he was afraid due to what had just happened to him at the hands of Biddle and the other officers, so plaintiff then told Biddle he did not need to go and he was alright.

Corporal Heather Clem-Johnson arrived on the scene after things had subsided and was briefed on the events by other officers.  She made her way over to the vehicle where plaintiff was being held.  She directed that plaintiff be unhandcuffed.  She then talked to plaintiff and asked him what had occurred.  Plaintiff told her what he knew about the events of the evening involving the disturbance between Dustin and Noell and answered all her questions the best he could.  Corporeal Clem-Johnson then asked plaintiff for permission to search the two houses, and he gave her consent to search.

Plaintiff may have briefly mentioned to Corporal Clem-Johnson the treatment he had received at the hands of the officers, but he did not recall saying anything to her in detail.  During the exchange with her, his focus was on the events involving Dustin.

Plaintiff then talked to his father and explained what had happened.  His father offered to drive him to the hospital.  Plaintiff's sister took several pictures of the bruises and red marks on plaintiff's face and head.  Plaintiff's father drove him to the hospital around 2:00 a.m.

Plaintiff sought examination for pain in his face/head, ribs and right shoulder.  Notes from the examination indicate plaintiff presented with left facial, right posterior lower rib cage and right anterior rib cage pain.  Plaintiff's main concern was his facial pain.  His rib cage pain was aggravated with movement.

The emergency physician was concerned about the injuries to plaintiff's head and chest and his breathing.  The examination that ensued included a CT scan and x-rays.  The x-rays revealed that plaintiff had a broken rib at "rib 11", which is known as a floating rib and is located near the bottom of the backside of the ribcage.

Defendants' version of the interaction between themselves and plaintiff differs meaningfully with regard to plaintiff's actions and demeanor toward them as he came up the stairwell from the basement.  They posit the following.

Upon arrival, Biddle and Svetz saw Vernail running towards 104, and as she was running she described the stabbing to them.  (SMF ¶ 17).  Biddle and Svetz went to investigate the back corner of the house.  (Id. ¶ 64).  It was very dark outside, and because it was outside of Uniontown's patrol area, they were unfamiliar with the area.  (Id. ¶ 63).  Biddle and Svetz saw plaintiff and he matched the generic description of "a white male" they had received over the radio.  (Id. ¶ 64-65).  Biddle was unable to see plaintiff's hands so he began directing plaintiff to show his hands.  (Id. ¶ 66).  Upon hearing shouts of "show me your hands," Vernail left her position and made her way to the back of the house.  (Id. ¶ 33).

When Hassenfeldt arrived at the scene, there were multiple PSP vehicles from the Uniontown Barracks already present and he saw troopers establishing a perimeter around 104. (SMF ¶ 41).  Hassenfeldt moved toward the back where he saw a white male (plaintiff) that he believed matched the description of the suspect.  (Id. ¶ 46).  Hassenfeldt observed plaintiff refuse to show his hands.  (Id. ¶ 46).

From Vernail's perspective, plaintiff was confrontational, argumentative, and refused to comply with instructions.  (Id. ¶ 37).  Trooper Martier arrived on the scene, approached the rear of the building, and heard someone giving the command "show me your hands." (Id. ¶ 75-76).  Martier too observed plaintiff "resisting."  (Id. ¶ 76).

Plaintiff disobeyed the officers' instruction to crawl up the steps, instead walking up the steps in "an aggressive manner, continuing to curse at troopers and act noncompliant."  (Id. ¶ 71).  Once plaintiff reached the top of the stairs, Biddle and Svetz tried to "gain compliance."  (Id. ¶ 72).  Plaintiff stiffened up and locked out his elbows, continuing to refuse to comply with Biddle and Svetz's instructions to place his hands behind his back and stop resisting.  (Id. ¶ 77).  Martier then assisted Svetz and Biddle, joining with the two officers in instructing plaintiff to cease his resistance.  (Id. ¶ 78).

Meanwhile, Vernail made her way down to the basement to attend to the individual on the basement floor, later identified as Dustin.  (Id. ¶ 38).  Hassenfeldt covered the basement door. (Id. ¶ 53).  Vernail and Hassenfeldt did not have any physical contact with plaintiff.  (Id. ¶ 57-59).

Biddle, Svetz, and Martier were able to get plaintiff on his stomach, but once on his stomach, plaintiff held his arms underneath his stomach and chest and continued actively to resist the troopers' instructions.  (Id. ¶ 79-80).  Biddle and Martier did not use any compliance

strikes.  (Id. ¶ 81-82).  Svetz recalls that he used a single, compliance strike (approximately half strength or a 5 out of 10) to plaintiff's back area, and plaintiff responded by giving Svetz his right arm, allowing Svetz to gain control in spite of plaintiff's continued resistance.[3]  (Id. ¶ 83). The officers were able to get control over plaintiff's arms, place him in handcuffs, and roll him over and place him in a seated position.  (SMF ¶ 84).  There was no need to gain compliance once plaintiff was handcuffed so no further force was applied thereafter.  (Id. ¶ 85).

Defendants move for summary judgment on the premise that the totality of the circumstances demonstrates that their interactions with plaintiff were entirely reasonable.  They maintain that Vernail and Hassenfeldt did not come into physical contact with plaintiff and therefore these two defendants did not "seize" plaintiff within the meaning of the Fourth Amendment.  Further, while Biddle, Svetz and Martier did have physical contact with plaintiff, from each of these officers' subjective perspectives, it was reasonable to believe plaintiff matched the description of the suspect; he refused to show his hands; he was confrontational, argumentative and refused to comply with instructions; he walked up the stairs in an aggressive manner, continuing to curse at the officers and act noncompliant; and once he reached the top of the stairs, he continued "to resist."  Thus, each of their actions was aimed at "gaining compliance" over plaintiff and thus constituted a reasonable and necessary use of force.

As part of establishing the reasonableness of their actions under the totality of the circumstances, defendants maintain that plaintiff's "versions" of what happened have shifted from amendment to amendment during the pleading stage and the discrepancies that were

_____

[3]  Plaintiff points out that Svetz's actual testimony was that he delivered between one and three closed-fist strikes to gain plaintiff's compliance and although he could not recall the exact number of blows, it definitely was more than one.

ultimately revealed by plaintiff's testimony have rendered his "accounts" "too incredible to be believed by reasonable minds."  And plaintiff purportedly may not sweep these inconsistencies away by reliance on a failure to interview theory; nor may he collectively lump the officers together in contradiction to the officers' separate and detailed accounts of the interaction. Finally, defendants contend that qualified immunity shields them from liability because any reasonable officer would have believed the conduct to be lawful and would not have recognized beyond debate that their actions in gaining compliance over plaintiff and securing the scene constituted a form of unconstitutional excessive force.

Plaintiff maintains that it is defendants' version of events as recounted in their brief that is unworthy of credence and contradicted by the record.  He notes that their accounts of his "non-compliance" and aggressive defiance are belied by the lack of any reference of plaintiff engaging in such conduct in the many pages of the police report summarizing the events of that night. This supposedly is particularly telling given that defendants were required to report the use of force under the applicable regulations and reporting policies and not one of them ever reported either plaintiff's supposed defiant and belligerent conduct nor the use of any force in response thereto or otherwise.  And plaintiff's version of events is further corroborated by the fact that plaintiff was not charged with any crime that night or thereafter.  Further, while defendants have highlighted cases that acknowledge the concept of "too incredible to be believed" in the resolution of summary judgment motions, those cases either did not actually turn on that concept or merely referenced the concept as part of a garden-variety determination that the opposing party's proffered evidence was insufficient to withstand the motion for summary judgment. Thus, from plaintiff's perspective, when the proper standards governing summary judgment are

applied, it assertedly is clear that there are material issues of fact in dispute that preclude summary judgment and the application of qualified immunity.

As an initial matter, defendants' attempts to have plaintiff's testimony found to be and thus pegged as "too incredible to be believed by reasonable minds" is unavailing.  That language commonly was utilized in evaluating summary judgment motions prior to the Supreme Court's seminal 1986 cases of Celotex, Matsushita and Anderson.  Those cases refocused the standards on the sufficiency of the evidence proffered in opposition to a motion for summary judgment. And it is those standards that must be utilized here.[4]

Moreover, the record as developed through discovery will support a finding that the officers who had physical contact with plaintiff as part of their effort to "bring him into compliance" engaged in the use of force as described by plaintiff.  In this regard, plaintiff may not have been a witness with great skills in articulating what he was saying or pinpointing the moments in time to which he was referring.  And he may not have communicated with precision when he and counsel were discussing the details that gave rise to the amendments to the pleadings.  And he admittedly does not have great memory skills.  But none of these skills or attributes are needed to survive summary judgment and, at this juncture, the scope of review is the evidentiary record as developed through discovery.  A review of that record indicates without

---

[4]  Of course, a case where the proffered evidence in opposition to a summary judgment motion is "too incredible to be believed by reasonable minds" would present a situation where the objective evidence of record was insufficient to create a genuine material issue of fact for trial and the movant would be entitled to judgment as a matter of law.  But as explained in more detail below, this case does not present a scenario where the evidence presented by the non-moving is "inherently incredible" or "too incredible to be believed by a reasonable jury."

13

question that plaintiff's testimony cannot be rejected as a matter law or otherwise weighed against the other competing inferences in resolving the instant motion.

Under the applicable standards, a review of plaintiff's deposition testimony establishes that he complied with the officers' demands in almost every regard, announced he would not comply with the demand to crawl up the stairs and indicated he would walk up out of the basement slowly with his hands in sight, which he did.  He then submitted to the officers by voluntarily going to the ground once he got to the top and placed his hands behind his back as directed.  It was only then that the officers handcuffed him while shoving his arms/hands up into his should blades and, after he was handcuffed, kneed him, punched him, pulled him up by his handcuffed arms while he was lying on his stomach - bending him like a banana - and kicked him in the face.

A number of other aspects of the record might be credited by the jury in a manner that would corroborate these aspects of plaintiff's account of the events.  First, the information provided to 911 dispatch made clear that the situation arose out of a domestic disturbance and Dustin was known to be the assailant.  Noell had obtained PFAs in the past as a result of similar incidents and the jury may well infer that the police had been to the location on a number of occasions in the past.  A local officer was present and imparted information to Vernail when she arrived and she in turn imparted information to Biddle and Svetz when they arrived.  The jury may consider these aspects of the record and reach an inference that defendants had reason to believe that plaintiff was not the individual involved in the criminal activity reported in the 911 call.  This would in turn undermine defendants' contention that all they knew was that the suspect was "a white male."  The potential for these findings and inferences is only augmented by the

14

fact that the officers were exchanging information at the location before they discovered plaintiff when he voluntarily responded to their verbal commands.

Moreover, the officers failed to mention any aspect of their interaction with plaintiff, his purported defiance and belligerence, and their need to "bring him into compliance" in the incident report from that night. As noted by counsel, defendants will be forced to admit they had a duty to make a report of any such interaction. The fact that none of them did could be interpreted by the jury to reflect a desire to avoid any inquiry into their handling of the situation along with an inference that they recognized more force than necessary might have been employed. And of course, resisting arrest and striking an officer are criminal offenses, and the fact that plaintiff was never charged with any such offense might also be considered by the jury as further supporting the determination that significant resistance by plaintiff did not occur.

Finally, the photographs taken of plaintiff's face assertedly on the night of the incident can be interpreted as supplying yet another form of corroboration. The images of the left side of plaintiff's forehead/face at Document Number 79-2 appear to depict bruising that reflects the outline of a footprint – extending from the middle of the forehead around the cheek and over to the left temple area – just as plaintiff described. Defendants' version of what occurred does not provide an alternative explanation of how plaintiff came to have bruising on his face in the outline of a footprint. Perhaps such an explanation exists. But at this juncture, a jury would be entitled to interpret the photographs as a form of evidence which corroborates plaintiff's account of being bent back like a banana and kicked in the face.

Having determined that plaintiff's version of what occurred is not as a matter of law beyond what a jury could find to be credible, the issue remains as to whether plaintiff's version can support a finding that the use of force at issue was unconstitutional. Claims of excessive

15

force in the context of an arrest or other "seizure" are to be analyzed under the Fourth

Amendment.  Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004); Sharrar v. Felsing, 128

F.3d 810, 820 (3d Cir. 1997) ("When an 'excessive force claim arises in the context of an arrest

or investigatory stop of a free citizen, it is most properly characterized as one invoking the

protections of the Fourth Amendment . . . .'") (quoting Graham v. Connor, 490 U.S. 386, 394

(1989)).  "The proper test for evaluating an excessive force claim is therefore one of objective

reasonableness," Sharrar, 128 F.3d at 820, which "requires careful attention to the facts and

circumstances of each particular case, including the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." Id. at 821; accord Couden v.

Duffy, 446 F.3d 483, 497 (3d Cir. 2006).

To determine whether an officer acted with objective reasonableness, a court must

balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests

against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal

citation omitted).  In this setting appropriate attention must be given "to the circumstances of the

police action, which are often 'tense, uncertain, and rapidly evolving.'" Groman, 47 F.3d at 634

(quoting Graham, 490 U.S. at 396).  The question is whether, under the totality of the

circumstances, the officers' actions objectively were reasonable in light of facts and

circumstances confronting them, without regard to their underlying intent or motivation. Kopec

v. Tate, 361 F.3d 772, 776 (3d Cir. 2004); Graham, 490 U.S. at 397.

An officer's actions must be evaluated from the perspective of a reasonable officer on the

scene. Rivas, 365 F.3d at 198; Lamont v. New Jersey, 637 F.3d 177, 183 (3d Cir. 2011).  In

undertaking this inquiry, the "calculus of reasonableness must embody allowance for the fact that

16

police officers are often forced to make split-second judgments [in tense and evolving circumstances] about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97; Couden, 446 F.3d at 497. Furthermore, "the court should not apply 'the 20/20 vision of hindsight,' but should instead consider the 'perspective of a reasonable officer on the scene.'" Couden, 446 F.3d at 497.

Assessing whether the use of force was reasonable in a particular setting is an individualized and highly fact-specific undertaking, but three guiding factors are to be considered: "(1) the severity of the crime at issue, (2) whether the suspect poses an imminent threat to the safety of the police or others in the vicinity, and (3) whether the suspect attempt[ed] to resist arrest or flee the scene." Santini v. Fuentes, 795 F.3d 410, 417 (3d Cir. 2015). "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Sharrar, 128 F.3d at 822; accord Kopec, 361 F.3d at 777; Couden, 446 F.3d at 497. "The reasonableness of the use of force is normally an issue for the jury." Rivas, 365 F.3d at 198 (quoting Abraham v. Raso, 183 F.3d 279, 290 (3d Cir. 1999).

Here, on the one-hand, the officers were investigating a domestic disturbance that involved a reported stabbing between domestic partners. Thus, the reported crime bringing them to the scene was a serious and violent one. On the other hand, the record contains information from which the jury might infer and ultimately conclude that the officers who interacted with plaintiff knew or had reason to know that he was not the individual suspected of committing the domestic assault. Nevertheless, the scene had not yet been secured and thus the officers were

17

entitled to use a reasonable degree of force to secure the area and assure their safety while
investigating what had occurred.

When the officers came upon plaintiff, he had just responded to their verbal commands to
come into sight and reveal himself.  He was at the bottom of the stairs and followed their
repeated commands to get down and get up.  After doing so three times, plaintiff announced to
the officers that he would not crawl up the stairs on his hands and knees, but instead would walk
up the basement stairs with his hands in the air.  And plaintiff did ascend the stairs slowly with
his hands in the air.  He was not brandishing a weapon nor did the officers become aware of any
information to suggest that plaintiff himself was armed and dangerous.  Plaintiff then got down
on the ground at the officers' direction in order to submit to their authority.  Thus, up until the
point that plaintiff went to the ground the officers had not observed any specific behavior by
plaintiff that indicated or suggested he posed a security risk or danger to the officers or anyone
else at the scene.[5]

Whether plaintiff resisted the officers' efforts to place him in handcuffs is hotly disputed.
But the court is obligated to read the record in the light most favorable to plaintiff at summary
judgment.  And plaintiff testified that he did not resist when the officers went to handcuff him.
Instead, the officers began to administer force in the form of shoving his arms and hands up into

_____

[5] Of course, defendants' version is that plaintiff was defiant and belligerent throughout the entire
process and continually refused to comply with directives.  He was swearing at them and telling
them to get off his property while failing to keep his hands continuously in sight.  But
notwithstanding the dispute about plaintiff's demeanor during his verbal communications with
the officers, it appears to be undisputed that plaintiff was expressing concern about his son and
the need to get his son medical assistance, which further supports an inference that plaintiff's
actual behavior was exhibiting a desire for the officers to help and did not present or pose an
actual threat to them.

his shoulder blades in the process of placing him in handcuffs and then began kneeing, punching and kicking him after he was cuffed.

Of course, the duration of the interaction was by its nature relatively short.  It appears that the officers intended to arrest plaintiff, even though they never formally charged him with a crime.  And during the entire process plaintiff was the only individual the officers saw on the scene and the only person with whom they were interacting.

Under the totality of the circumstances, the officers' forceful manipulation of plaintiff's arms and hands in the process of handcuffing him did not rise to the level of excessive force.  The objective reasonableness of each particular use of force must be evaluated from "the perspective of the officer at the time of the incident and not with the benefit of hindsight." Santini, 795 F.3d at 417; accord Graham, 490 U.S. at 396 (same).  In other words, in the context of an excessive force claim, the "standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment."  Graham, 490 U.S. at 396 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

At the moment the officers were in the process of handcuffing plaintiff, they had just arrived on the scene of a reported domestic disturbance involving a stabbing between domestic partners.  It was dark and they did not know the exact location of the perpetrator or whether anyone else might be present.  They were in the process of securing the scene and believed that handcuffing plaintiff was a necessary step in achieving that objective.  The forceful manipulation of plaintiff's arms and hands in that process, while perhaps quite painful and alarming, falls short of the type of force which transgresses the standards of reasonableness in violation of the Fourth Amendment.  Cf. Graham, 490 U.S. at 396-97 (the "calculus of reasonableness must embody

19

allowance for the fact that police officers are often forced to make split-second judgments - in [tense and rapidly evolving settings]  - about the amount of force that is necessary in a particular situation."); Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995) ("It is well settled that '[p]olice officers are privileged to commit a battery pursuant to a lawful arrest.'").

The same is true of the efforts to cradle plaintiff's legs.  Plaintiff indicated that a female officer was forcefully grasping his legs and restricting the movement of his lower extremities while the other officers were attempting to place him in handcuffs and directly thereafter when the male officers were forcefully pinning him down by applying their knees to his back.  The forceful cradling of plaintiff's legs while in the process of placing him in handcuffs and even for the immediate period thereafter to assure plaintiff had been restrained falls short of the type of force which transgresses the standards of reasonableness in violation of the Fourth Amendment.

In contrast, the officers' kneeing, punching and kicking plaintiff in the face stands on different footing.  Plaintiff testified that he did not resist the officers' efforts to handcuff him and, after the handcuffs were on, the officers on each side shoved their knees into his back in a manner that significantly restricted his breathing.  They also punched him repeatedly.  Then, one officer jumped up, kicked plaintiff in the back of the head as he jumped across him, and told the other officers to "pull him up," which they did by pulling on his handcuffed arms that were behind his back, bending him up like a banana.  The officer that had jumped up then kicked plaintiff across the front of his face/forehead with the flat part of his foot.  And all of this occurred while plaintiff was lying face down on the ground in handcuffs.

Given the import of plaintiff's testimony, a jury could conclude that no reasonable officer would believe or perceive he was actively resisting the officers' efforts to restrain him or attempting to flee at the time he was kneed, punched and kicked.  Given that a jury could so find,

the final Graham factor weighs in plaintiff's favor.  In other words, the defendants' use of force in the form of kneeing, punching and kicking plaintiff could be found by a reasonable jury to have been neither objectively necessary nor a reasonable use of force under the totality of the circumstances.  Compare Couden, 446 F.3d at 497 (finding excessive force was used where "[t]here was no evidence that [the plaintiff] was resisting arrest or attempting to flee" at the time the force was used); Castellani v. City of Atl. City, 2017 WL 3112820, at *14 (D. N.J. July 21, 2017) (holding that the officer's conduct was objectively unreasonable under the Graham factors, because "a reasonable jury could . . . find that [the officer] unreasonably came in after [the plaintiff] was restrained and unleashed his K9 to attack [the plaintiff] . . . after [he] was already subdued by five officers on the ground and offering no resistance."); Green v. New Jersey State Police, 246 F. App'x 158, 163 (3d Cir. 2007) (under the Graham and Sharrar factors, "it would be excessive to grab and choke an arrestee's throat, especially before using lesser force; to hit him on the head twice with a flashlight; and to kick him when he is already restrained and on the ground"); Scully v. City of Jersey Police Department, 2018 WL 6804274, *7-8 (D. N.J. Dec. 27, 2018) ("a jury could conclude that it was not reasonable for Boamah to punch Plaintiff ten to twelve times after he was already lying face down on the ground; the same conclusion applies to Mitchell kicking Plaintiff repeatedly in the side") (collecting cases).  Thus, plaintiff's evidence that the officers kneed, punched and kicked him after he was handcuffed establishes a jury question as to whether the use of that force was excessive under the totality of the circumstances.

Defendants' efforts to invoke qualified immunity for the conduct of kneeing, punching and kicking plaintiff is unavailing.  The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Under this doctrine government officials are immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting [a deprivation of a constitutional violation resulting in harm or injury], . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the deprivation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).

Qualified immunity is "an entitlement not to stand trial or face the burdens of litigation." Saucier, 533 U.S. at 200 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  A government official performing discretionary functions is immune from claims for damages unless the evidence of record as read in the light most favorable to the non-moving party will support findings that (1) the official violated the plaintiff's constitutional rights, and (2) the constitutional right that was violated was clearly established.  Id. at 201.  The courts retain discretion in deciding which of the two prongs of this analysis should be addressed first.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Qualified immunity is an affirmative defense and the burden of proving the prerequisites for its application rests with the party seeking to invoke it.  Thomas v. Independence Twp., 463 F.3d 285, 292 (3d Cir. 2006); Hicks v. Feeney, 850 F.2d 152, 159 (3d Cir. 1988).  "The issue of qualified immunity is generally a question of law, although a genuine issue of material fact will preclude summary judgment on qualified immunity."  Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009).  In deciding qualified immunity questions at summary judgment, a court must view the facts in the light most favorable to the plaintiff.  Id.

The doctrine "balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231; accord Burns v. Pa. Dept. of Corrections, 642 F.3d 163, 176 (3d Cir. 2011).  And where its protections are appropriate, the immunity "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson, 555 U.S. 231 (internal quotation omitted).  Thus, when properly applied, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Under the first prong of a qualified immunity analysis, the use of force is contrary to the Fourth Amendment "if it is excessive under objective standards of reasonableness." Green, 246 F. App'x at 161 (quoting Saucier, 533 U.S. at 202).  As discussed above, the courts in this jurisdiction assess whether a seizure of a citizen involved the use of force that was not objectively reasonable under the Fourth Amendment by examining the totality of the circumstances confronting the officer(s) through the lens of the Graham and Sharrar factors. See, e.g., Kopec, 361 F.3d at 776; Santini, 795 F.3d at 417; Monticciolo v. Robertson, 2017 WL 4536119, *6 (D. N.J. Oct. 11, 2017).

Here, an examination of the totality of the circumstances pursuant to an application of those factors supports plaintiff's account that the officers kneeing, punching and kicking plaintiff while he was not resisting their efforts to secure the scene and after he was placed in handcuffs will support a finding that this conduct violated plaintiff's right to be free from the use of excessive force.  Thus, under the first prong, a jury may determine the facts in a manner that will establish a violation of plaintiff's rights as protected by the Fourth Amendment.

Having determined that the record will support a finding that plaintiff's rights were violated by the use of excessive force when plaintiff was not resisting and/or after he was handcuffed, the second prong of the qualified immunity analysis asks whether "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018). The purpose of this inquiry is to account for "the reality that 'reasonable mistakes can be made as to the legal constraints on particular police conduct.'"  Hickman v. Borough, 2017 WL 1197806, at *11 (D.N.J. Mar. 31, 2017) (quoting Santini, 795 F.3d at 418).

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  James v. New Jersey State Police, 957 F.3d 165, 169 (3d Cir. 2020) (quoting Wesby, 138 S. Ct. at 589).  This assessment involves "an 'objective (albeit fact-specific) question,' under which '[an officer]'s subjective beliefs . . . are irrelevant."  Id. (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)).  The inquiry is undertaken from the perspective of a reasonable officer, and "only the facts that were knowable to the defendant officer" are taken into account. Id. (quoting White v. Pauly, -- U.S. --, 137 S. Ct. 548, 550 (2017) (citation omitted).

A plaintiff might be able to show that a right is clearly established if the violation in question "[is] 'obvious.'"  Id. (citing Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (quoting Hope v. Pelzer, 536 U.S. 730, 738 (2002)).  "In the excessive-force context, 'obvious cases' are those that obviously violate Graham . . . and Tennessee v. Garner, 471 U.S. 1 [] (1985)."  Id. (citing Brosseau, 543 U.S. at 199).  But the fact that a particular use of force can be found to be unreasonable and excessive under the general principles of Graham or Garner is not in itself

sufficient, because "Garner and Graham do not by themselves create clearly established law outside 'an obvious case.'" White, 137 S. Ct. at 552.

It follows that "in most cases, a plaintiff must show that a right is clearly established because 'the violative nature of [the] particular conduct [was] clearly established.'" James, 957 F.3d at 169 (quoting Ziglar v. Abbasi, -- U.S. --, 137 S. Ct. 1843, 1866 (2017) (quoting Mullenix, 136 S. Ct. at 308)).  In other words, "'settled law' . . . must 'squarely govern[ ]' the specific facts at issue." Id. (quoting Wesby, 138 S. Ct. at 590 and Kisela v. Hughes, -- U.S. --, 138 S. Ct. 1148, 1152 (2018)).  This standard can be satisfied by identifying a case where an officer acting under similar circumstances was held to have violated the constitutional provision at issue.  James, 957 F.3d 169-70 (quoting White, 137 S. Ct. at 552).

In this setting "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'" Id. (quoting Bland v. City of Newark, 900 F.3d 77, 84 (3d Cir. 2018) (citation omitted)); accord Wesby, 138 S. Ct. at 589–90 ("To be clearly established, a legal principle must ... [be] dictated by controlling authority or a robust consensus of cases of persuasive authority[.]").  A case directly on point is not required to show a right is clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).  In other words, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." McLaughlin v. Watson, 271 F.3d 566, 572 (3d Cir. 2001).

There was sufficient precedent to place defendants on notice that kneeing, punching and/or kicking a detainee while the detainee is not resisting or after the detainee is handcuffed

25

and lying on the ground in a prone position violates that detainee's Fourth Amendment right to be free from the use of excessive force.   It is well settled that a police officer effectuating an arrest may only use the amount of force that is necessary under the circumstances.  See, e.g., Thomas v. City of Erie, 236 F. App'x 772, 776 (3d Cir. 2007) ("A plaintiff may bring a claim pursuant to § 1983 where the police use more force than is necessary to arrest him.").  And the use of such force would extend to the need to secure the scene where officers are in the process of responding to a call reporting a domestic disturbance involving physical violence.  But where the Graham and Sharrar factors no longer support the need for extraordinary force, such as where the detainee is immobilized and neither resisting nor attempting to flee, the degree of force that an officer can use is reduced.

On a more specific level, a collection of persuasive authority within this jurisdiction has supplied adequate notice for every reasonable officer to understand that subjecting an unarmed individual being detained for the purpose of securing an investigation scene (or effectuating an arrest) to the use of blunt, traumatic force in the form of kneeing, punching and/or kicking the individual after the individual 1) has his arms handcuffed behind his back, is lying prone on his or her stomach and is not resisting or 2) has casually submitted to the officer's authority by lying down on his or her stomach and is not resisting - when no other individuals are actively present on the scene, violates the Fourth Amendment's prohibition of the use of excessive force. Numerous cases have recognized that the gratuitous use of such force is unconstitutional.  See, e.g., Gulley v. Elizabeth City Police Dep't, 340 F. App'x 108, 110 (3d Cir. 2009) (finding it clearly established that "beating a suspect on the face and head, who is lying down and not resisting arrest, would constitute excessive force in violation of the Fourth Amendment."); Green, 246 F. App'x at 163 (holding it clearly established that choking, hitting on the head and

26

kicking an arrestee after he or she is restrained on the ground constitute forms of excessive force); Noble v. City of Camden, 112 F. Supp. 3d 208, 228-29 (D. N.J. 2015) ("At the time Defendants acted, the law was clear that beating an unarmed suspect who was not resisting arrest violates the Fourth Amendment's prohibition against excessive force."); see also Morrison v. Bd. of Trustees of Green Twp., 583 F.3d 394, 404 (6th Cir. 2009) ("This Court has consistently held in light of the reasonableness standard that 'use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.'") (citation omitted); Wade v. Colaner, 2010 WL 1490590, *7-10 (D. N.J. April 13, 2010) (in contrast to the brandishing of a weapon in effectuating an arrest, the officer's use of blunt force and pepper spray after the plaintiff already had been subdued and partially restrained was unreasonable and thus could be found to be excessive); Scully, 2018 WL 6804274 at *7 (holding that the repeated kicking and punching of the plaintiff after he was lying on the ground and not resisting the officers' authority could be found by a jury to be excessive use of force and opining that when the incident occurred "the law was clear that beating an unarmed suspect who was not resisting arrest violates the Fourth Amendment's prohibition against excessive force."); cf. Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009) ("[A]t the time of the incident in 2001, it was established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued.").

It follows that the defendants had adequate notice that the use of kneeing plaintiff to the point where he could not breathe and punching and kicking him after he submitted to the officers' authority and was not resisting and/or had been handcuffed with his arms behind his

back constituted a violation of the Fourth Amendment.  Of course, plaintiff has the burden to establish at trial that such where the facts when plaintiff interacted with defendants.

Having determined that the above-asserted conduct presents a claim for excessive force that survives defendants' substantive and qualified immunity challenges at summary judgment, defendants' remaining grounds for summary judgment must be considered.  More specifically, defendants contend that plaintiff has failed to advance sufficient facts to demonstrate that defendants Vernail and/or Hassenfeldt engaged in physical contact with plaintiff, thus defeating any claim for use of excessive force.  Relying on these officers' accounts of what happened, defendants assert that plaintiff has failed to establish that these officers "seized" plaintiff within the meaning of the Fourth Amendment.  Plaintiff maintains that defendant Vernail assisted officers Biddle, Martier and Svetz in administering the excessive force by cradling the lower portion of plaintiff's legs while the others kneed, punched and kicked him and Hassenfeldt was present when the same occurred and failed to stop it.

"[I]n the face of a motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial."  Jutrowski v. Township of Riverdale, 904 F.3d 280, 291 (3d Cir. 2018).  This principle is grounded in the historical roots of tort law, the jurisprudence governing excessive force cases and the current consensus of the appellate courts.  Id. at 289-92.

In Jutrowski, the court held that where a § 1983 plaintiff's evidence at summary judgment was insufficient to identify which of several officer officers in the vicinity actually kicked the plaintiff and thus inflicted the claimed excessive force, all of the potential actors were entitled to summary judgment due to the failure to meet the personal involvement requirement.  Id. at 293. This must necessarily be the result even though the cost might be immunizing a responsible

28

officer who has succeeded in precluding the victim of a constitutional violation from gaining the information needed to make a positive identification.  Id.

In contrast to a situation where the plaintiff's proof merely presents the possibility of each actor's participation in the alleged wrongdoing, an evidentiary proffer that is sufficient to support a finding that each actor had at least some role in the alleged wrongdoing is sufficient.  For example, in Smith v. Mensinger, 293 F.3d 641 (3d Cir. 2002), the plaintiff conceded that he could not see all five of the defendants when they were pushing his head into cabinets and walls and applied force to him from behind.  Id. at 650.  But his testimony was that "all of them" had participated in beating him, even though he could not see them during the interaction.  Under these circumstances the court held that his inability to see the officers inflict the actual blows "neither negate[d] their involvement nor their liability as a matter of law."  Id.  Thus, the situation in Smith "ultimately involved nothing more than a dispute about '[t]he extent of each officer's participation,' which 'is . . . a classic factual dispute to be resolved by the fact finder,'" whereas the circumstances in Jutrowski "involved a dispute about the possibility of each officer's participation," which was insufficient.  Jutrowski, 904 F.3d at 290-91.

Here, plaintiff repeatedly emphasized that all of the officers were involved with the beating that occurred as he was lying face-down in the dark, prone on his stomach and submitting to their authority.  Specifically, he identified Biddle as the officer who 1) jumped up after plaintiff had been handcuffed, kneed and punched 2) directed the other two officers at plaintiff's side to pull him up and 3) then kicked him after they did so.  His testimony as to Vernail was that she cradled his legs while the officers were placing the handcuffs on him, and with the benefit of favorable reading, as the kneeing and punching directly ensued thereafter. Plaintiff did not identify any specific conduct undertaken by Hassenfeldt.

29

As previously explained, Vernail's cradling of plaintiff's legs while the other officers were in the process of placing him in handcuffs does not rise to the level of excessive force under the totality of the circumstances. The kneeing and punching purportedly ensued immediately thereafter, and there is a lack of record evidence to demonstrate that Vernail purposefully continued to restrict plaintiff's movements in order for the other officers to beat plaintiff or otherwise subject him to excessive force. The evidence of record and the reasonable inferences drawn therefrom point only to the proposition that this series of events transpired very quickly. Thus, the evidence pertaining to Vernail's personal involvement in the unconstitutional conduct of kneeing, punching and kicking plaintiff is insufficient and she is entitled to summary judgment.

Hassenfeldt is entitled to summary judgment as well. In an effort to overcome the lack of evidence identifying Hassenfeldt's personal role in the alleged unconstitutional use of force, plaintiff resorts to the contention that Hassenfeldt testified that the entire interaction with plaintiff lasted two to five minutes. From this piece of testimony, plaintiff posits that Hassenfedlt properly can be held liable for his failure to intervene and stop the other officers' unconstitutional conduct. But this proposition is based upon unwarranted extrapolations from generalized information that falls short of the evidence needed to sustain such a theory of liability.

A police officer can have a duty to intervene to prevent a constitutional violation that occurs in his or her presence. See Smith, 293 F.3d at 650 ("'If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983.'") (quoting Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986)). However, liability for

such a failure only arises where the officer has "a realistic and reasonable opportunity to intervene" and fails to do so. Id. at 651. Thus, to establish a Fourth Amendment violation for failure to intervene against Hassenfeldt, plaintiff must demonstrate that he specifically (1) observed and understood that a constitutional violation was taking place; (2) had a reasonable and realistic opportunity to intervene; and (3) failed to do so. See Williams v. Guard Bryant Fields, 535 F. App'x. 205, 210 (3d Cir. 2013); see also Fears v. Beard, 532 F. App'x. 78, 82 (3d Cir. 2013) ("An officer's failure to intervene can be the basis of [a constitutional] violation under § 1983 if the officer, upon witnessing another's use of excessive force . . ., 'had a reasonable opportunity to intervene and simply refused to do so.'") (quoting Smith, 293 F.3d at 651). Plaintiff has the burden of producing sufficient evidence to support these requirements. Lora-Pena v. Denney, 760 F. Supp. 2d 458, 468 (D. Del. 2011); Koutsogiannis v. Rogalski, 2019 WL 669803, *9 (D. N.J. Feb. 19, 2019).

Plaintiff's contention that Hassenfeldt's testimony will support a finding that he sat back and idly watched as the other officers beat plaintiff for a length of time that created a reasonable and realistic opportunity to intervene is unsupported by the actual testimony given by Hassenfeldt. While Hassenfeldt did estimate that the entire interaction with plaintiff encompassed at least two minutes or so, a fair and detached review indicates that the estimate of time entailed from the moment plaintiff became the focus of the officers' attention through the removal and securing of plaintiff in a manner that then permitted the officers to proceed into the basement to investigate plaintiff's statements that his son had just attempted suicide and was lying on the basement floor bleeding. During this process Hassenfeldt was leaning on or near the house and focused on the entrance to the basement in order to assure that Dustin did not emerge from the basement unexpectedly. And during this entire time Hassenfeldt denied ever seeing

31

plaintiff being subjected to any specific forms of the excessive force at issue.  Testimony of

Charles Hassenfeldt (Doc. No. 74-8) at 21-31.

Plaintiff's reference to Hassenfeldt's testimony indicating he was on the scene while the

interaction with plaintiff occurred falls short of presenting sufficient evidence to show 1)

Hassenfeldt witnessed the specific use of excessive force at issue, 2) had a reasonable and

realistic opportunity to intervene, and 3) failed to do so.  Plaintiff's testimony or any of the other

evidence of record fails to rectify this deficiency of evidence.  It follows that Hassenfeldt is

entitled to summary judgment.

Plaintiff's testimony when read pursuant to the governing standards supplies a sufficient

basis for the personal involvement of the remaining officers.  Defendants Biddle, Matier and

Svetz admitted having interacted with plaintiff in putting him in handcuffs and "bringing him

into compliance."  Plaintiff testified that four officers were involved in the process, one of whom

was Vernail.  He identified Biddle as the officer that got up, jumped across him, and then kicked

him in the face.  The other two officers were kneeing him in a way that was depriving him of air

and then punching him, all of which occurred after he voluntarily submitted to their authority and

was handcuffed.  This testimony, although choppy and somewhat disjointed due in part to

defense counsel's persistent demands that plaintiff stop testifying about the collective actions of

the officers while working together and provide specific defendant-by-defendant descriptions of

who was doing what and when, provides a sufficient basis to submit the matter to a jury to

determine the extent to which each of the three remaining defendants contributed to any post-

submission kneeing, punching and kicking that the jury finds to have occurred gratuitously.

For the reasons set forth above, defendants' motion for summary judgment will be granted as to defendants Vernail and Hassenfeldt. The motion will be denied in all other aspects. An appropriate order will follow.

Date: March 21, 2022

<u>s/David Stewart Cercone</u>
David Stewart Cercone
Senior United States District Judge

cc:    Joel Sansone, Esquire
       Elizabeth Tuttle, Esquire
       Massimo A. Terzigni, Esquire
       Sarah J. Simkin, Esquire
       Justin A. Gayle, Esquire